16-1568
Constitution Pipeline Co. v.
New York State Department of
Environmental Conservation

1                   UNITED STATES COURT OF APPEALS

2                         FOR THE SECOND CIRCUIT

3                                - - - - - -

4                             August Term, 2016

5   (Argued:  November 16, 2016                    Decided:  August 18, 2017)

6                            Docket No. 16-1568

7   _____

8   CONSTITUTION PIPELINE COMPANY, LLC,

9                                                        *Petitioner*,

10                                 - v. -

11  NEW   YORK   STATE   DEPARTMENT   OF   ENVIRONMENTAL
12  CONSERVATION; BASIL SEGGOS, Acting Commissioner, New York State
13  Department of Environmental Conservation; JOHN FERGUSON, Chief Permit
14  Administrator, New York State Department of Environmental Conservation,

15                                                      *Respondents*,

16  STOP THE PIPELINE, CATSKILL MOUNTAINKEEPER, INC., SIERRA
17  CLUB, RIVERKEEPER, INC.,

18                                                      *Intervenors.**
19  _____

20  Before:  KEARSE, WESLEY, and DRONEY, *Circuit Judges*.

21            Petition for review of respondents' decision denying application for certification

    ─────────────────────

    *       The Clerk of Court is directed to amend the official caption to conform with the
            above.

1    pursuant to § 401 of the Clean Water Act, 33 U.S.C. § 1341, that petitioner's proposed interstate

2    natural gas pipeline would comply with New York State water quality standards ("§ 401

3    certification").  Respondents denied the application on the ground that petitioner had  not complied

4    with requests for relevant information.  Petitioner contends (1) that respondents exceeded the statutory

5    time limitations for the State's review of the application and that they must therefore be ordered to

6    notify the United States Army Corps of Engineers ("USACE") that the State waives its right to issue

7    or deny § 401 certification, thereby allowing USACE to issue a permit to petitioner under § 404 of

8    the Clean Water Act, *see* 33 U.S.C. § 1344(a); and (2) alternatively, that respondents' decision should

9    be vacated on the ground that the denial of the application was arbitrary, capricious, and ultra vires,

10   and that respondents should be ordered to grant the requested § 401 certification.  To the extent that

11   petitioner challenges the timeliness of respondents' decision, we conclude that we lack jurisdiction

12   over that challenge.  As to the merits, we conclude that respondents' actions were within their

13   statutory authority and that the decision was not arbitrary or capricious.

14                    Petition dismissed in part and denied in part.


15                        JOHN  F.  STOVIAK,  Philadelphia,  Pennsylvania (Saul Ewing,
16                            Philadelphia, Pennsylvania, Elizabeth Utz Witmer, Saul Ewing,
17                            Wayne, Pennsylvania; Yvonne E. Hennessey, Barclay Damon,
18                            Albany, New York, on the brief), *for Petitioner*.

19                        BRIAN LUSIGNAN, Assistant Attorney General, Albany, New York
20                            (Eric T. Schneiderman, Attorney General of the State of New
21                            York, Barbara D. Underwood, Solicitor General, Andrew B.
22                            Ayers, Senior Assistant Solicitor General, Frederick A. Brodie,
23                            Assistant Solicitor General, Lisa M. Burianek, Deputy Bureau
24                            Chief, Albany, New York, on the brief), *for Respondents*.

1     KARA E. PAULSEN[**], White Plains, New York (Karl S. Coplan,
2         Todd D. Ommen, Anne Marie Garti, Pace Environmental
3         Litigation Clinic, Inc., White Plains, New York, on the brief),
4         *for Intervenor Stop the Pipeline.*

5     MONEEN NASMITH, New York, New York (Deborah Goldberg,
6         Christine Ernst, Earthjustice, New York, New York, on the
7         brief), *for Intervenors Catskill Mountainkeeper, Inc., Sierra*
8         *Club, and Riverkeeper, Inc.*

9     SIDLEY AUSTIN, Washington, D.C. (Roger R. Martella, Jr., Ryan C.
10        Morris, Tobias S. Loss-Eaton, Washington, D.C.; Linda E.
11        Kelly, Quentin Riegel, Leland P. Frost, Manufacturers' Center
12        For Legal Action, Washington, D.C.; Steven P. Lehotsky,
13        Sheldon B. Gilbert, U.S. Chamber Litigation Center,
14        Washington, D.C.; Kevin B. Belford, Michael L. Murray,
15        Washington, D.C.; Leslie A. Hulse, Washington, D.C.; Dena
16        E. Wiggins, Washington, D.C.; Andrea J. Chambers, Katie
17        Leesman, Ballard Spahr, Washington, D.C., of counsel), *filed*
18        *a brief for Amici Curiae National Association of*
19        *Manufacturers, Chamber of Commerce of the United States of*
20        *America, Interstate Natural Gas Association of America,*
21        *American Gas Association, American Petroleum Institute,*
22        *American Chemistry Council, Natural Gas Supply Association,*
23        *American Forest & Paper Association, and Process Gas*
24        *Consumers Group, in support of Petitioner.*

25     Kimberly Ong, New York, New York (Albert K. Butzel, New York,
26        New York, of counsel), *filed a brief for Amici Curiae Natural*
27        *Resources Defense Council, Water Defense, Waterkeeper*
28        *Alliance, Earthworks, PennEnvironment, Peconic Baykeeper,*
29        *and Chesapeake Bay Foundation, in support of Respondents.*

30   KEARSE, *Circuit Judge*:

31       Petitioner Constitution Pipeline Company, LLC ("Constitution"), petitions pursuant

32   to 15 U.S.C. § 717r(d)(1) for review of an April 22, 2016 decision of the New York State Department

33   of Environmental Conservation ("NYSDEC" or the "Department") denying Constitution's application

---

[**]   Law student appearing pursuant to Local Rule 46.1(e).

1   for certification pursuant to § 401 of the Federal Water Pollution Control Act, more commonly known

2   as the Clean Water Act (or "CWA"), 33 U.S.C. § 1341 ("§ 401 certification"), that Constitution's

3   proposed interstate natural gas pipeline would comply with New York State (or "State") water quality

4   standards (or "WQS").  NYSDEC denied the application on the ground that Constitution had not

5   provided sufficient information.  In its petition, Constitution contends principally (1) that NYSDEC

6   exceeded the § 401(a) time limitations for the State's review of the application and that NYSDEC

7   must therefore be ordered to notify the United States Army Corps of Engineers ("USACE" or "Army

8   Corps of Engineers" or "Army Corps") that the State has waived its right to act upon Constitution's

9   § 401 certification application, thereby allowing USACE to issue a permit to petitioner under § 404

10  of the Clean Water Act, *see* 33 U.S.C. § 1344(a); and (2) alternatively, that Constitution submitted

11  sufficient information and that NYSDEC's decision should be vacated on the ground that its denial

12  of the application was arbitrary, capricious, and ultra vires, and that NYSDEC should be ordered to

13  grant the requested § 401 certification.  To the extent that Constitution challenges the timeliness of

14  the NYSDEC decision, we dismiss the petition for lack of jurisdiction.  As to the merits, we conclude

15  that NYSDEC's actions were within its statutory authority and that its decision was not arbitrary or

16  capricious, and we deny the petition.


17                                        I. BACKGROUND


18          Constitution proposes to construct a 121-mile interstate natural gas pipeline in

19  Pennsylvania and New York, approximately 98 miles of which would be in New York.  In connection

20  with this project (the "Project"), Constitution applied for, to the extent pertinent here, a "certificate

4

1    of public convenience and necessity" from the Federal Energy Regulatory Commission ("FERC"),

2    15 U.S.C. § 717f(c), a CWA § 401 water quality certification (or "WQC") from New York State that

3    the Project would comply with State water quality standards (*see* 6 N.Y.C.R.R. parts 701 to 704), and

4    a CWA § 404 permit from the Army Corps of Engineers to allow discharges into United States

5    navigable waters.

6    A. *Proceedings Before FERC*

7              In September 2012, FERC announced that it would prepare an environmental impact

8    statement ("EIS") for Constitution's Project and asked Constitution to submit a feasibility study

9    explaining how it would install the pipeline across waterbodies (generally using that term to refer to

10   streams but not wetlands). For such installations, there is a trenched method--a dry open-cut crossing-

11   -which involves diverting a stream, digging a trench through the banks and stream bed, installing and

12   burying the pipeline, and then allowing the stream to resume flowing in the stream bed. (*See*, *e.g.*,

13   FERC Final Environmental Impact Statement ("FEIS") pages 2-21 to 2-22.) There are also trenchless

14   crossing methods--including Horizontal Directional Drill (or "HDD"), Direct Pipe (or "DP"), and

15   conventional bore--which involve digging pits on either side of a waterbody and boring or drilling

16   underneath the stream. FERC asked Constitution to provide information with regard to trenchless

17   construction methods for crossing several categories of streams, including those classified by the

18   states as sensitive or high quality and those greater than 30 feet wide where a dry construction method

19   would not be feasible.

1    1.  *Constitution's Trenchless Feasibility Study*

2         Constitution submitted to FERC a study discussing trenchless crossing methods.  (*See*

3    Constitution, Feasibility Study: Trenchless Construction Methods for Sensitive Environmental

4    Resource Crossings (Nov. 2013) ("Constitution 2013 Feasibility Study" or "Study") pages 1-3 to 1-5.)

5    Trenchless methods do not disturb soil or organisms in the stream banks, stream bed, or in the stream

6    itself, but require disturbing surrounding areas to clear space for installation pits; there are also risks

7    of mid-project drill breakage, with leakage of drill fluid into the waterbody.  (*See* Constitution 2013

8    Feasibility Study page 2-3; FEIS page 2-24.)  Use of the trenched method does not require as much

9    installation space or present the risk of drill failure; but it requires stream diversion and digging into

10   the stream bed and banks.  (*See*, *e.g.*, FEIS pages 2-21 to 2-22.)

11        The Constitution feasibility study dealt principally with locations where the waterbody

12   was designated by New York or Pennsylvania as sensitive or high quality.  (*See* Constitution 2013

13   Feasibility Study pages 2-2 to 2-3.)  As a result, Constitution eliminated from consideration for

14   trenchless crossings all but 89 of the 251 New York waterbodies that would be crossed by the pipeline

15   or affected by pipeline construction.

16        The remaining 89 locations were addressed in three phases.  The Study's "Phase I[]

17   Desktop Analysis" (*id*. pt. 1.0 page 1-1) further reduced the number of New York waterbodies

18   considered by Constitution for trenchless crossings from 89 to 26, in part by eliminating streams less

19   than 30 feet wide, even if they were classified by New York as sensitive or high-quality (*see id*. pages

20   2-1, 2-3).  Constitution stated that trenchless crossings for such narrower waterbodies would

21   potentially require workspace requirements significantly greater than those generally needed for a

22   conventional dry crossing method.  (*See id*. page 2-3.)  Thus, unless such a waterbody was

6

1    immediately associated with a larger wetland and/or waterway complex crossed by the Project or was

2    located in the immediate vicinity of a proposed rail or roadway crossing, "Constitution did not

3    evaluate waterbody crossings less than 30 feet in width" (*id*.).

4            Phase II was a "Cost/Time/Construction Workspace Impact Analysis." (*Id*. page 3-1;

5    *see also id*. pt. 1.0 page 1-1 ("Trenchless construction methods are limited" not only by such matters

6    as "underlying geology, available workspace, [and] available time," but also by "available finances

7    budgeted for a capital project.").)  This phase eliminated waterways from trenchless-crossing

8    consideration largely on the basis of expense; as a result, there remained only 13 waterbody crossings

9    in New York for which Constitution planned to investigate a "formal trenchless construction design."

10    (*Id*. pages 3-2 to 3-4 & tbl.3.2-1.)  The Study stated that Phase III, a "geotechnical field analysis" of

11    each of the 13 locations, was in progress.  (*Id*. page 5-1.)  Constitution thus planned to use the

12    trenched method for 238 of the 251 New York waterbodies to be crossed.

13           2. *NYSDEC Comments and the FEIS*

14            In connection with FERC's announcement of a planned EIS for the Constitution

15    pipeline--and its subsequent draft EIS ("DEIS")--NYSDEC submitted numerous letters to FERC.  The

16    first noted that NYSDEC's preferred method for crossing waterbodies is a trenchless method, in

17    particular

18           Horizontal Directional Drilling (HDD) because it has the advantages of
19           *minimizing land disturbance, avoiding the need for dewatering of the stream,*
20           *leaving the immediate stream bed and banks intact, and reducing erosion,*
21           *sedimentation and Project-induced watercourse instabilities*.

22    (November 7, 2012 Letter from NYSDEC to FERC at 3 (emphasis added).)  Stating that the DEIS

23    should identify the New York classification of each stream the proposed pipeline would cross,

1   NYSDEC urged FERC to "evaluate cases where other methods are proposed" and have Constitution

2   "*explain why HDD will not work or is not practical for that specific crossing*." (*Id.* (emphasis

3   added).)

4           A May 2013 letter again stated that "NYSDEC's preferred methodology for *all stream

5   crossings* is . . . (HDD)"; that letter also stated that "[w]ithin stream crossings, pipelines should be

6   buried at least 6' below a stream bottom.  Minimum cover depth is not subject to variance based on

7   field conditions."  (May 28, 2013 Letter from NYSDEC to FERC ("NYSDEC May 2013 Letter")

8   at 1-2 (emphasis added).)

9           In September 2013, NYSDEC wrote to join a request by the Army Corps for additional

10  analysis of whether the Constitution pipeline could be routed along a certain interstate highway, a

11  route referred to as "Alternative M."  (September 25, 2013 Letter from NYSDEC to FERC at 1.)

12  Constitution responded by arguing that Alternative M would have greater environmental impact than

13  Constitution's proposed route and noting likely difficulties in obtaining highway agencies' approvals.

14  (*See* October 22, 2013 Letter from Constitution to NYSDEC at 2-4.)

15          In 2014, FERC issued its DEIS, which drew criticism from several sources including

16  NYSDEC.  (*See*, *e.g.*, March 24, 2014 Letter from NYSDEC to FERC and Army Corps at 1-2 (urging

17  a revised DEIS to include "geotechnical feasibility studies for *all trenchless crossing locations*," as

18  well as "site specific blasting plans that include protocols for in-water blasting and the protection of

19  aquatic resources and habitats" (emphasis added)); April 7, 2014 Letter from NYSDEC to FERC and

20  Army Corps ("NYSDEC April 2014 Letter") at 1-5 (adding additional comments and requesting

21  additional analysis of Alternative M which, in NYSDEC's view, would reduce the amount of

22  disturbance of higher-quality waterbodies).)

1        FERC issued its FEIS in 2014 without significantly expanding on several aspects of

2    the DEIS.  It did not address NYSDEC's concern that Constitution had not developed site-specific

3    blasting plans.  (*See* FEIS pages 4-15 to 4-16; DEIS page 4-16.)  The FEIS added discussion of two

4    new versions of Alternative M proposed by NYSDEC (*see* FEIS pages 3-46 to 3-47), but rejected

5    them without analyzing disturbances to high-quality waterbodies (*compare id*. pages 3-32 to 3-47 *with*

6    NYSDEC April 2014 Letter at 3-4.  And the FEIS stated that the pipeline would be buried 60 inches

7    below streams in normal soil conditions and 24 inches in areas of "consolidated rock" (FEIS

8    page 2-16), as contrasted with the NYSDEC May 2013 Letter's statement that the pipe needed to be

9    buried "at least 6' below a stream bottom" (NYSDEC May 2013 Letter at 2).

10        The FEIS expanded on the DEIS's waterbody crossing information but repeated DEIS

11    explanations for why relatively few crossings were slated to be crossed by trenchless techniques,

12    stating, *inter alia*, that "[a]ccording to Constitution, trenchless crossing methods are not practical

13    [except in limited circumstances] for waterbody crossings less than 30 feet in width" and that

14    "Constitution indicated that such crossings would be impractical due to minimum length requirements,

15    depth of pipeline considerations, and workspace requirements," and describing the areas that would

16    be required for trenchless crossing "[a]ccording to Constitution" (FEIS page 4-50).  The FEIS stated

17    that

> 18    *[t]he potential impacts on waterbodies associated with the use of conventional*
> 19    *bore or Direct Pipe trenchless crossing methods are considered minimal when*
> 20    *compared to other crossing methods.*  The waterbody and its banks, and
> 21    typically the entire immediate riparian zone, would not be disturbed by
> 22    clearing or trenching; rather, the pipe would be installed below the feature.

23    (*Id*. page 4-56 (emphasis added).)  FERC added:

> 24    *We concur with Constitution's assessment that it is not practicable to use*
> 25    *trenchless crossing methods* where waterbodies were listed as ephemeral or

1        intermittent (because these waterbodies are likely to be dry at the time of
2        crossing) or *for waterbodies less than 30 feet in width (as extra workspaces*
3        *needed would offset potential benefits). . . .*

4    (FEIS, App'x S, page S-52 (emphases added).)  The FEIS noted that Constitution had completed

5    geotechnical feasibility studies at only two New York sites.  (*See* FEIS page 4-4.)

6    B.  *Proceedings Before NYSDEC*

7        While its application to FERC for a certificate of public convenience and necessity was

8    pending, Constitution submitted an application to the Army Corps for a CWA § 404 permit for the

9    discharge of dredged or fill material while constructing the pipeline and to NYSDEC for a CWA

10    § 401 certification that the Project would comply with State water quality standards.  In December

11    2014, NYSDEC issued a notice that Constitution's application was complete; but on December 31,

12    it asked Constitution for more information about stream crossings.  In January-March 2015,

13    Constitution submitted more information to NYSDEC, and on April 27, 2015, at NYSDEC's request,

14    Constitution withdrew and resubmitted its § 401 application.  (Constitution had also withdrawn and

15    resubmitted its § 401 application at NYSDEC's request in May 2014.)

16    1.  *Stream-Crossing Information Requests by NYSDEC*

17        On January 23, 2015, staff from Constitution and NYSDEC met to discuss trenchless

18    stream-crossing methods (*see* January 14, 2015 email from NYSDEC Project Manager Stephen M.

19    Tomasik to Constitution engineering consultant Keith Silliman; January 27, 2015 email from Tomasik

20    to Constitution Environmental Project Mananger Lynda Schubring ("NYSDEC January 27, 2015

21    email")).  Prior to that meeting, Constitution wrote to NYSDEC stating that it had

1        conducted subsurface geotechnical investigations at the majority of the
2        proposed . . . (HDD) and . . . (DP) trenchless locations. Results of the
3        subsurface geotechnical investigations revealed crossing locations that present
4        a high risk of failure if a trenchless method is used. As a result, trenchless
5        crossing locations with a high risk of failure are not feasible and have been
6        modified to a dry open cut design. Since the last . . . submissions to the
7        USACE, three (3) HDD or DP locations affecting six (6) wetlands or
8        waterbodies have changed to an open cut construction method . . . .

9    (January 22, 2015 Letter from Schubring to Tomasik at 1.) Constitution also stated that six other

10   originally proposed trenchless crossings would be crossed by a trenched method, "to address various

11   concerns raised by [state and local] authorities relative to the trenchless crossings of specific public

12   roadways and associated infrastructure." (*Id*. at 2.) After the January 23 meeting, NYSDEC

13   requested additional documents that Constitution personnel had said informed its decision to use the

14   trenched crossing method at two locations, as well as "information about stream crossings that we

15   requested on 12/31/2014." (NYSDEC January 27, 2015 email).

16        In response, Constitution submitted feasibility evaluations based on geotechnical

17   studies for four locations: two wetlands crossings and two waterbody crossings. One of the

18   waterbody feasibility evaluations concluded that using either HDD or DP was infeasible due to

19   subsurface soil conditions; the other did not address the feasibility of trenchless crossing methods, and

20   instead discussed only a contingency open-cut crossing to be used if the proposed DP crossing failed.

21        In February 2015, Constitution submitted to NYSDEC a document titled "Draft

22   Trenchless Feasibility Study Edits" ("Constitution 2015 Feasibility Draft") that appears to be a version

23   of part of the 2013 trenchless feasibility study that Constitution had submitted to FERC, merely

24   expanding on the manner in which each trenchless method operates. Again there was no discussion

25   of stream crossings site-by-site. The Constitution 2015 Feasibility Draft stated that

26        Constitution recognizes that, *in general*, performing . . . (HDD) for streams

1    less than 30 feet in width causes greater net environmental impacts than a dry
2    open cut method and this threshold is an *industry recognized standard*.
3    Constitution has not identified any NYSDEC regulation, formally adopted
4    policy or guidance document that would warrant deviating from this standard.

5  (*Id*. at 1 (emphases added).)  It also discussed the Direct Pipe method, stating that "it is *likely* that

6  additional forest will require clearing to perform DP for *most* of the protected stream crossings," and

7  that "*[m]any*" streams are in valleys whose slopes make the DP method infeasible.  (*Id*. at 2-3

8  (emphases added).)  In addition, the Constitution 2015 Feasibility Draft stated that DP technology is

9  of "limited availability," leading Constitution to conclude that using "DP technology for . . . streams

10  less than 30 feet in width is *not a realistic or viable expectation within a reasonable period of time*."

11  (*Id*. at 3 (emphasis added).)

12      In March 2015, NYSDEC sent Constitution a list of 20 waterbody locations that

13  NYSDEC "wants crossed via HDD," stating that NYSDEC "is *still expecting an evaluation as to*

14  *whether an HDD is technically feasible for each of these streams*."  (March 17, 2015 email from

15  NYSDEC Major Project Management Unit Chief Christopher M. Hogan to Silliman (emphasis

16  added).)  In April 2015, as indicated above, Constitution withdrew and resubmitted its § 401 WQC

17  request.

18      2. *Subsequent Discussions*

19      In May 2015, NYSDEC noted that it had agreed to "eliminate" four streams from

20  "further consideration for trenchless crossing methods."  (May 22, 2015 email from Tomasik to

21  Schubring, Silliman, et al.)

22      In July 2015, a member of NYSDEC's staff emailed to certain Army Corps staff

23  members a "Confidential" message attaching a "VERY PRELIMINARY version of a Constitution

1    permit" (July 20, 2015 email from Tomasik to Kevin J. Bruce et al., Army Corps), which included a

2    table of 19 locations that "shall be crossed using a trenchless construction method"--unless an

3    "experienced and qualified engineer" concludes that the techniques are "not constructible or not

4    feasible" (Confidential Draft NYSDEC Certification Conditions at 17). The draft, however, required

5    Constitution, "*[p]rior to beginning construction of any trenchless stream crossing*," to "*submit a*[]

6    . . . 'Trenchless Crossing *Plan*' *for each* trenchless stream crossing," including "detailed engineering

7    plans" for each location. (*Id*. at 18 (emphases added).)

8        In September 2015, Constitution submitted to NYSDEC an Environmental

9    Construction Plan, attached to which was a Blasting Plan. (*See* Constitution, Environmental

10    Construction Plan 50 (Aug. 2015).) This plan listed 253 "[a]reas of shallow depth to bedrock crossed

11    by the [pipeline]" in New York, but stated that "[a] final determination on the need for blasting will

12    be made at the time of construction." (Constitution, Blasting Plan (Aug. 2015) ("Blasting Plan")

13    pages 1-1, 1-2 & tbl.1.2-2, 4-1.) The Blasting Plan identified regulations and a permit that would

14    govern blasting in Pennsylvania, but stated that "[a]ll blasting operations in New York will be

15    conducted in accordance with an in-stream b[l]asting protocol *to be prepared* by Constitution." (*Id*.

16    page 4-1 (emphasis added).)

17    C. *NYSDEC's Decision Denying § 401 Certification*

18        In a 14-page letter to Constitution dated April 22, 2016, NYSDEC denied

19    Constitution's application for CWA § 401 certification ("NYSDEC Decision" or "Decision"), stating

20    that "the Application fails in a meaningful way to address the significant water resource impacts that

21    could occur from this Project and has failed to provide sufficient information to demonstrate

1    compliance with New York State water quality standards," NYSDEC Decision at 1. Although also

2    noting the lack of adequate information as to such issues as the feasibility of the Alternative M route,

3    blasting information, pipe burial depth, and wetlands crossings, *see*, *e.g.*, *id*. at 11-14, the Decision

4    focused principally on Constitution's failure to provide information with respect to stream crossings.

5            NYSDEC noted that Constitution's Project "would disturb a total of 251 streams . . . ,

6    87 of which support trout or trout spawning," and that "[c]umulatively, construction would disturb

7    a total of 3,161 linear feet of streams and result in a combined total of 5.09 acres of temporary stream

8    disturbance impacts." NYSDEC Decision at 8. It stated that although

9               [f]rom inception of its review of the Application, NYSDEC directed
10               Constitution to demonstrate compliance with State water quality standards and
11               required site-specific information for each of the 251 streams impacted by the
12               Project[, and] NYSDEC informed Constitution that *all 251* stream crossings
13               must be evaluated for environmental impacts and that trenchless technology
14               was the preferred method for stream crossing[, and that t]his information was
15               conveyed to Constitution and FERC on numerous occasions since November
16               2012[,] . . . Constitution has not supplied the Department with the necessary
17               information for decision making.

18    *Id*. (emphasis in original).

19            The Decision stated that because some form of trenchless technology is the "most

20    protective method for stream crossings,"

21               NYSDEC directed Constitution to determine whether a trenchless technology
22               was constructible *for each stream crossing*. On a number of occasions
23               NYSDEC identified the need to provide information so that it could evaluate
24               trenchless stream installation methods (see Table 2, below); however,
25               Constitution has not provided sufficient information . . . .

26    *Id*. (footnote omitted) (emphasis added).

27            Table 2 in the Decision principally chronicled NYSDEC's requests of Constitution--

28    both directly and indirectly in its submissions to FERC--and noted Constitution's resistance, including

the following:

    ■ In June 2012, "NYSDEC stated in a letter to Constitution that for protected streams and wetlands, trenchless technology is the preferred method for crossing and should be considered for *all* such crossings (emphasis added)."

    ■ On November 7, 2012, "[i]n comments to FERC, NYSDEC stated that for streams and wetlands the preferred method for crossing is trenchless technology," and that as to each crossing where another method is proposed "Constitution should explain why trenchless crossing technology will not work or is not practical for that specific crossing."

    ■ On April 9, 2013, "FERC[] . . . directed Constitution to address all of the comments filed in the public record by other agencies . . . including all comments from the NYSDEC."

    ■ On May 28, 2013, at a "[m]eeting" of "Constitution and NYSDEC staff . . . NYSDEC reiterate[d] that acceptable trenchless technology was the preferred installation method and that stream crossings should be reviewed for feasibility of using those technologies."

    ■ In July and August 2013, on "[f]ield visits of proposed stream crossings prior to permit applications to the Department[, a]t each crossing, NYSDEC emphasized to Constitution staff that trenchless technology is preferred/most protective."

    ■ **In its November 2013 Trenchless Feasibility Study, Constitution "arbitrarily eliminated from any consideration for trenchless crossing methods" "all streams less than 30' wide."**

    ■ On December 31, 2014, at a meeting with Constitution staff, "NYSDEC indicated that *the Trenchless Feasibility Study was inadequate*, *e.g.* provided insufficient justification and *removed all streams less than 30 feet in width from analysis*." NYSDEC gave Constitution "an informational request table including required technical information."

    ■ On January 13, 2015, an "Army Corps of Engineers letter reiterate[d] a request for a feasibility analysis of trenchless crossings."

    ■ At a January 23, 2015 "[m]eeting between Constitution and NYSDEC staff . . . **Constitution stated it was unable to complete the [informational request] table [it received from NYSDEC] on December 31, 2014[].** NYSDEC staff indicated that the justification for stream crossing methods was insufficient and that appropriate site specific information must be provided."

■ In a January 28, 2015 "[c]onference call[,] *NYSDEC reiterated its request for a site specific analysis* of trenchless stream crossings *for all streams including those under 30 feet wide*."

**■ On February 5, 2015, "Constitution provided an updated example** of a trenchless feasibility study **but that example continued to exclude streams up to 30 feet wide from analysis and did not provide detailed information of the majority of streams."**

NYSDEC Decision at 9-10 (emphases added).

Although the Decision's Table 2 ended with the February 2015 entry, the Decision noted that Constitution's "unwillingness to provide a complete and thorough[] Trenchless Feasibility Study" persisted:

[I]n May 2015, Constitution provided detailed project plans for 25 potential trenchless crossings, **but only two of those plans were based on full geotechnical borings that are necessary to evaluate the potential success of a trenchless design. Detailed project plans including full geotechnical borings for the remaining stream crossings have not been provided to the Department.**

*Id*. at 11 (emphasis added). The NYSDEC Decision stated that

[d]ue to the lack of detailed project plans, including geotechnical borings, the Department has determined to deny Constitution's WQC Application because the supporting materials supplied by Constitution do not provide sufficient information for each stream crossing to demonstrate compliance with applicable narrative water quality standards for turbidity and preservation of best usages of affected water bodies. Specifically, the Application lacks sufficient information to demonstrate that the Project will result in no increase that will cause a substantial visible contrast to natural conditions.[10]

Furthermore, the Application remains deficient in that it does not contain sufficient information to demonstrate compliance with 6 NYCRR Part 701 setting forth conditions applying to best usages of all water classifications. Specifically, "the discharge of sewage, industrial waste or other wastes shall not cause impairment of the best usages of the receiving water as specified by the water classifications at the location of the discharge and at other locations

16

1                      that may be affected by such discharge."[11]

2                               [10]  6 NYCRR § 703.2.

3                               [11]  6 NYCRR § 701.1.

4    NYSDEC Decision at 12 & nn.10-11.  The Decision added that

5                 [c]umulatively, impacts to both small and large streams from the
6                construction and operation of the Project can be profound and include loss of
7                available habitat, changes in thermal conditions, increased erosion, creation of
8                stream instability and turbidity, impairment of best usages, as well as
9                watershed-wide impacts resulting from placement of the pipeline across water
10               bodies in remote and rural areas (See Project Description and Environmental
11               Impacts Section, above).  Because the Department's review concludes that
12               Constitution did not provide sufficient detailed information including site
13               specific project plans regarding stream crossings (*e.g.* geotechnical borings)
14               the Department has determined to deny Constitution's WQC Application for
15               failure to provide reasonable assurance that each stream crossing will be
16               conducted in compliance with 6 NYCRR §608.9.

17    NYSDEC Decision at 12; *see* 6 N.Y.C.R.R. § 608.9(a)(2) ("The applicant" for a CWA § 401

18    certification "must demonstrate compliance with sections 301-303, 306 and 307 of the Federal Water

19    Pollution Control Act, as implemented by . . . water quality standards and thermal discharge criteria

20    set forth in Parts 701, 702, 703 and 704 of this Title . . . .").

21                                          II.  DISCUSSION

22                  In its petition for review (or "Petition"), Constitution contends principally (1) that

23    NYSDEC failed to issue its Decision within a reasonable time as required by § 401 and thus must be

24    required to inform USACE that NYSDEC has waived its right to rule on Constitution's application

25    for a WQC, thereby enabling the Army Corps to grant Constitution a permit for its pipeline Project,

26    or (2) alternatively, that Constitution submitted sufficient information and that NYSDEC's decision

should be vacated on the ground that its denial of the application was arbitrary, capricious, and ultra vires, and that NYSDEC should be ordered to grant the requested § 401 certification. For the reasons that follow, we (1) conclude that Constitution's first contention, which would have us treat NYSDEC's Decision as an act that is void, lies beyond the jurisdiction of this Court, and (2) conclude that NYSDEC's Decision was not ultra vires, arbitrary, or capricious.

A. *Constitution's Argument that NYSDEC Waived Its § 401 Authority*

The Natural Gas Act (or "NGA"), 15 U.S.C. §§ 717-717z, sets out provisions with respect to, *inter alia*, the construction of transportation facilities for natural gas, *see id.* § 717f. Such projects are also subject to restrictions under other federal statutes, including provisions of the Clean Water Act, *see*, *e.g.*, *id.* § 717b(d)(3). Section 401 of the CWA requires an applicant for a federal permit to conduct any activity that "may result in any discharge into the navigable waters" of the United States to obtain "a certification from the State in which the discharge . . . will originate . . . that any such discharge will comply with," *inter alia*, the state's water quality standards. 33 U.S.C. § 1341(a)(1).

As to petitions for review relating to such applications, § 717r of the NGA divides jurisdiction between the Circuit in which the facility is proposed to be constructed and the United States Court of Appeals for the District of Columbia Circuit. It states, in pertinent part, as follows:

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to . . . section 717f of this title is proposed to be constructed . . . *shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a* Federal agency (other than [FERC]) or *State administrative agency acting pursuant to Federal law to* issue, condition, or *deny any* permit, license, concurrence, or *approval* (hereinafter collectively

18

1                          referred to as "permit") *required under Federal law . . . .*

2                                   **(2) Agency delay**

3                          *The United States Court of Appeals for the District of Columbia shall*
4                          *have original and **exclusive** jurisdiction over any civil action for the review of*
5                          *an **alleged failure to act** by a Federal agency (other than [FERC]) or State*
6                          *administrative agency acting pursuant to Federal law to issue, condition, or*
7                          *deny any permit required under Federal law . . . .*

8 15 U.S.C. §§ 717r(d)(1)-(2) (emphases added).  We regard subsection (2)--titled "Agency delay"--as

9 encompassing not only "an alleged failure to act" but also an allegation that a failure to act within a

10 mandated time period should be treated as a failure to act.  This is the nature of Constitution's first

11 argument.

12             Constitution points out that CWA § 401 provides that "[i]f" a "State . . . agency" from

13 which an applicant for a federal permit has sought a water quality certification "fails or refuses to act

14 on [the] request for certification, within a reasonable period of time (which shall not exceed one year)

15 after receipt of such request, the certification requirements of this subsection shall be waived with

16 respect to such Federal application." 33 U.S.C. § 1341(a)(1).  Constitution argues that NYSDEC did

17 not issue its Decision until 32 months after Constitution submitted its initial application, 16 months

18 after NYSDEC issued notice that that initial application was complete, 15 months after the deadline

19 imposed by FERC, *nearly* a year ("359 days") after Constitution's 2015 withdrawal-and-resubmission

20 of its application--and eight months after Constitution claims it was advised by NYSDEC that

21 NYSDEC "had everything it needed to issue a Section 401 Certification."  (Constitution brief in

22 support of Petition at 28-29.)  Constitution argues that NYSDEC "waived its right" to rule on the

23 certification application and must be required to so notify the Army Corps.  (*Id.* at 37.)

24             We note first that there is nothing in the administrative record to show that NYSDEC

1    received the information it had consistently and explicitly requested over the course of several years--

2    much less anything to support Constitution's claim that NYSDEC said "it had" all of the information

3    it required "to issue" the requested certification (*id*. at 29). Although Constitution proffered in this

4    Court non-record declarations from certain of its personnel, those "outside-the-record declarations and

5    associated portions of [Constitution]'s brief" were stricken. *Constitution Pipeline Co. v. Seggos*, No.

6    16-1568 (2d Cir. Oct. 3, 2016).

7    Second, Constitution's "waive[r]" argument is that the NYSDEC Decision must be

8    treated as a nullity by reason of NYSDEC's "*failing to act* within the prescribed time period under the

9    CWA" (Constitution brief in support of Petition at 37 (emphasis added)). Such a failure-to-act claim

10   is one over which the District of Columbia Circuit would have "exclusive" jurisdiction, 15 U.S.C.

11   § 717r(d)(2). *See generally Weaver's Cove Energy, LLC v. Rhode Island Department of*

12   *Environmental Management*, 524 F.3d 1330, 1332 (D.C. Cir. 2008). Accordingly, we dismiss

13   Constitution's timeliness argument for lack of jurisdiction.

14   B. *Constitution's Challenge to the Merits of NYSDEC's Decision*

15   Judicial review of an administrative agency's denial of a CWA § 401 certificate is

16   limited to grounds set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-706. We review

17   the agency's interpretation of federal law *de novo*; if the agency correctly interpreted federal law, we

18   review its factual determinations under the arbitrary-and-capricious standard, *see id*. § 706(2)(A);

19   *Islander East Pipeline Co. v. McCarthy*, 525 F.3d 141, 150 (2d Cir. 2008) ("*Islander East II*");

20   *Islander East Pipeline Co. v. Connecticut Department of Environmental Protection*, 482 F.3d 79, 94

21   (2d Cir. 2006) ("*Islander East I*").

1          1. *Federal Law*

2          Constitution argues that as a matter of law, NYSDEC's "jurisdiction to review"--and

3   "in effect, veto"--FERC determinations is preempted by FERC's performance of its obligations under

4   the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, to prepare a DEIS and

5   a FEIS. (Constitution brief in support of Petition at 37, 39.) We disagree that NYSDEC's action was

6   preempted.

7          Although NEPA requires federal-agency review of virtually any possible

8   environmental effect that a proposed action may have, *see generally* 40 C.F.R. § 1502.16, it does not

9   impose substantive standards. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350

10  (1989). "[T]hrough a set of action-forcing procedures," NEPA "require[s] that agencies take a hard

11  look at environmental consequences," but it is "well settled that NEPA itself does not mandate

12  particular results[; it] simply prescribes the necessary process." *Id*. (internal quotation marks omitted).

13  Thus, NEPA states, in pertinent part, that "[n]othing in section 4332 or 4333 of this title shall in any

14  way affect the specific statutory obligations of any Federal agency . . . to act, or refrain from acting

15  contingent upon the recommendations or certification of any . . . State agency." 42 U.S.C. § 4334.

16          We note also that while the Natural Gas Act generally preempts state laws, it states that

17  "[e]xcept as specifically provided[,] . . . nothing" in the NGA "affects the rights of States under . . .

18  the [CWA] (33 U.S.C. § 1251 et seq.)," 15 U.S.C. § 717b(d). CWA § 511, in turn, preserves the

19  states' authority to determine issues of a planned project's effect on water quality. *See* 33 U.S.C.

20  § 1371(c)(2)(A). CWA § 401(a)(1) requires that an entity such as Constitution, proposing to construct

21  an interstate pipeline, obtain from each state in which the pipeline is to be constructed a certification

22  that "any . . . discharge" from a proposed activity "will comply with the applicable provisions of [33

21

1    U.S.C. §§] 1311, 1312, 1313, 1316, and 1317." 33 U.S.C. § 1341(a)(1). Sections 1311, 1312, 1316,

2    and 1317 establish, and allow the Environmental Protection Agency ("EPA") to establish, standards

3    governing numerous aspects of water quality; and § 1313 allows states to develop their own water

4    quality standards and submit them to the EPA for approval. If the EPA approves a state's water

5    quality standards, it publishes a notice of approval and they become the state's EPA-approved

6    standards, regulating water quality in that state. *See* 33 U.S.C. §§ 1313(a), (c).

7         The New York State water quality standards, approved by the EPA, *see generally* 42

8    Fed. Reg. 56,786, 56,790 (Oct. 28, 1977), are found in 6 N.Y.C.R.R. parts 701 to 704, and were

9    invoked by the NYSDEC Decision, which stated that "[d]enial of a WQC may occur when an

10   application fails to contain sufficient information to determine whether the application demonstrates

11   compliance with the above stated State water quality standards and other applicable State statutes and

12   regulations due to insufficient information." NYSDEC Decision at 7; *see also id.* at 12 nn.10-11 and

13   accompanying text (quoted in Part I.C. above). The State standards classify waterbodies in terms of,

14   *inter alia*, potability and their suitability for various activities such as swimming and fishing, *see* 6

15   N.Y.C.R.R. pt. 701; they set standards for characteristics such as water odor, color, and turbidity, *see*

16   *id*. pt. 703; and they regulate thermal discharges into waterbodies, *see id*. pt. 704.

17        Thus, the relevant federal statutes entitled NYSDEC to conduct its own review of the

18   Constitution Project's likely effects on New York waterbodies and whether those effects would

19   comply with the State's water quality standards.

20        CWA § 401(a)(1), as pertinent here, states that "[n]o license or permit shall be granted

21   if [a § 401] certification has been denied by the State," 33 U.S.C. § 1341(a)(1). Thus, we have indeed

22   referred to § 401 as "a statutory scheme whereby a single state agency *effectively vetoes* an energy

22

1    pipeline that has *secured approval from a host of other federal and state agencies.*" *Islander East II*,

2    525 F.3d at 164 (emphases added); *accord Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991)

3    ("Through [the § 401 certification] requirement, *Congress intended that the states would retain the*

4    *power to block, for environmental reasons, local water projects that might otherwise win federal*

5    *approval.*" (emphasis added)).

6             Constitution also argues that NYSDEC's demands for information with regard to, *e.g.*,

7    possible alternative routes for the planned pipeline (*see*, *e.g.*, NYSDEC Decision at 3 (NYSDEC

8    "asked Constitution to analyze alternative routes that could have avoided or minimized impacts to an

9    extensive group of water resources")), as well Constitution's planned blasting sites and the depth

10    at which the pipe would be buried, exceeded NYSDEC's authority (Constitution brief in support of

11    Petition at 38). We need not address all of these contentions. A state's consideration of a possible

12    alternative route that would result in less substantial impact on its waterbodies is plainly within the

13    state's authority. *See*, *e.g.*, *Islander East II*, 525 F.3d at 151-52. And where an agency decision is

14    sufficiently supported by even as little as a single cognizable rationale, that rationale, "by itself,

15    warrants our denial of [a] petition" for review under the arbitrary-and-capricious standard of review.

16    *See*, *e.g.*, *id*. at 158.

17             2. *Application of the Arbitrary-and-Capricious Standard*

18             Under the arbitrary-and-capricious standard, "[a] reviewing court may not itself weigh

19    the evidence or substitute its judgment for that of the agency." *Islander East II*, 525 F.3d at 150.

20    "Rather," we "consider[] whether the agency 'relied on factors which Congress has not intended it to

1    consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

2    decision that runs counter to the evidence before the agency, or is so implausible that it could not be

3    ascribed to a difference in view or the product of agency expertise.'" *Id.* at 150-51 (quoting *Motor*

4    *Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance*

5    *Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*")).

6            [W]ithin the prescribed narrow sphere, judicial inquiry must be searching and
7            careful. . . . Notably, a court must be satisfied from the record that the agency
8            . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for
9            its action. . . . Further, the agency's decision must reveal a rational connection
10           between the facts found and the choice made.

11   *Islander East II*, 525 F.3d at 151 (internal quotation marks omitted). If there is "sufficient evidence

12   in the record to provide rational support for the choice made by the agency," we must uphold its

13   decision. *Id.* at 152.

14           Usually, the agency's choice concerns whether the applicant's submission of the

15   relevant information warrants the granting of the application. In the present case, as summarized in

16   Part I.C. above, NYSDEC denied Constitution's application because Constitution refused to provide

17   information that NYSDEC had repeatedly requested with regard to, *inter alia*, issues such as those

18   just discussed in Part II.B.1. above, and issues as to the feasibility, site-by-site, of trenchless methods

19   for most of the 251 stream crossings planned in New York. Constitution does not contend that those

20   requests were not made. Indeed, in its own brief in this Court, Constitution acknowledges that the

21   NYSDEC Decision (the "Denial") explained that NYSDEC had requested but had not received

22   sufficient information with regard to:

23           ♦ construction methods and site-specific project plans for stream crossings
24           (Denial at 8-11 . . .);

25           ♦ alternative routes (*Id.* at 11 . . .);

24

1        ♦ pipeline burial depth in stream beds (*Id*. at 12-13 . . .);

2        ♦ procedures and safety measures Constitution would follow in the event that
3        blasting is required (*Id*. at 13 . . .);

4        ♦ Constitution's plans to avoid, minimize, or mitigate discharges to navigable
5        waters and wetlands (*Id*. at 13-14 . . .); and

6        ♦ cumulative impacts (*Id*. at 3, 5, 7, 14  . . .).

7    (Constitution brief in support of Petition at 21-22.)  Nowhere does Constitution claim to have

8    provided the above categories of information; rather, it insists that it provided NYSDEC with

9    "sufficient" information (*id*. at 52-62) because use of trenchless crossing methods for streams less than

10   30 feet wide is not "an industry recognized standard" (Constitution 2015 Feasibility Draft at 1).

11       However, in order to show that an agency's decision--or its request for additional

12   information as to alternative methods--is arbitrary and capricious, "it is not enough that the regulated

13   industry has eschewed a given [technology]."  *State Farm*, 463 U.S. at 49.  Industry preferences do

14   not circumscribe environmental relevance.

15       In *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), the Supreme

16   Court considered whether a federal agency, presented with new evidence, should have been required

17   to file a new supplemental environmental impact statement; the Court stated that the matter of whether

18   additional information is "significant" is "a classic example of a factual dispute the resolution of

19   which implicates substantial agency expertise," as to which the courts "must defer to the informed

20   discretion of the responsible . . . agencies," *id*. at 376-77 (internal quotation marks omitted).  We

21   cannot conclude that any less deference is due an agency's determination that it should not grant a

22   permit application where it has already determined that additional information is needed, and the

23   applicant refuses to supply it.  *Cf. University of Iowa Hospitals & Clinics v. Shalala*, 180 F.3d 943,

1    955 (8th Cir. 1999) (where agency regulations required substantiation of costs for which

2    reimbursement was sought, denial of reimbursement based on inadequate documentation was not

3    arbitrary and capricious); *Mendoza v. Secretary, DHS*, 851 F.3d 1348, 1356 (11th Cir. 2017) (denial

4    of visa application where applicants declined to answer relevant questions relating to eligibility was

5    not arbitrary and capricious; the applicants "were free to refuse to answer [the agency's] questions

6    . . . but they did so at their own peril"). Indeed, an agency's decision may be found "arbitrary and

7    capricious" for "*issuing* a permit with insufficient information." *Utahns For Better Transportation*

8    *v. United States Department of Transportation*, 305 F.3d 1152, 1192 (10th Cir. 2002) (emphasis

9    added).

10           Here, the record amply shows, *inter alia*, that Constitution persistently refused to

11    provide information as to possible alternative routes for its proposed pipeline or site-by-site

12    information as to the feasibility of trenchless crossing methods for streams less than 30 feet wide--*i.e.*,

13    for the vast majority of the 251 New York waterbodies to be crossed by its pipeline--and that it

14    provided geotechnical data for only two of the waterbodies.

15           In sum, NYSDEC is responsible for evaluating the environmental impacts of a

16    proposed pipeline on New York waterbodies in light of the State's water quality standards. Applying

17    the arbitrary-and-capricious standard of review, we defer to NYSDEC's expertise as to the

18    significance of the information requested from Constitution, given the record evidence supporting the

19    relevance of that information to NYSDEC's certification determination. We conclude that the denial

20    of the § 401 certification after Constitution refused to provide relevant information, despite repeated

21    NYSDEC requests, was not arbitrary or capricious.

1                                   CONCLUSION


2              We have considered all of Constitution's arguments and have found in them no basis

3     for granting the petition for review.  Insofar as the petition contends that the NYSDEC Decision is

4     a nullity on the ground that it was untimely, the petition is dismissed for lack of jurisdiction; to the

5     extent that the petition challenges the NYSDEC Decision on the merits, the petition is denied.